LINUS SANFORD, Appellant, v. JOSEPH KERN.

Division One, November 27, 1909.

1. PRIVATE ROAD: Prescription: Contract: Limitation. Where plaintiff's case to establish a private road rests on prescription, that is, an adverse user as of right, openly and uninterruptedly, for more than ten years, in pursuance to an executed contract, supported by a valuable consideration, that prescriptive right is effectuated by the Statute of Limitations.

2. LIMITATIONS: By Whom Invocable. The Statute of Limitations can be invoked only by a person claiming by right, and not by wrong. No flux of time will ripen a bad title into a good one unless possession is based upon a claim of right.

3. PRIVATE ROAD: Prescription: Consideration. The building of a fence for the landowner in return for a private roadway through the land, is an adequate consideration in law to support the prescriptive right. And if the fence was built and the road opened the contract was executed.

4. ——: ——: License: Revocable. Where the fence was needed to prevent the incursion of breachy stock, and plaintiff, under agreement that he was to have a private road through the land, built the fence, and it was accepted as a compliance with the contract, his use of the road, opened and used in pursuance thereof, was not a mere permissive license revocable at will.

5. ———: ———: ———: ———: **Use by Others.** Nor is his possessory right in any way impaired by the fact that neighbors when they liked used the private road or lane, so opened and constructed. Such use did not destroy his easement.

6. ———: ———: **Necessary Possession.** The possession necessary to establish the prescriptive right is the best possession the subject-matter is susceptible of. If an easement right to a fenced private roadway, based upon a claim of right, it is such possession as is usually taken of an open lane—continued use as a roadway, and kept fit for use by repairs.

7. ———: ———: **Intent.** Use under an adverse claim of right rests in intent, and intent rests in acts and words.

8. ———: ———: **Grant: Limitation.** A prescriptive right does not rest exclusively in grant; it may be established in the same way as title to land, that is, by adverse possession under a claim of right uninterrupted for ten years.

9. ———: ———: **License: Revocable: Equitable Estoppel.** A license to use a way or an easement, though without consideration at its inception, may not be revoked at will, where, from the very nature of the license, the licensee was expected to go to great expense in order to enjoy it and where that expense has been incurred. In such case equitable estoppel arises, and the relations of the parties may not be severed and the easement destroyed at the whim and by the act of the licensor; they must be severed, if at all, upon equitable principles.

10. ———: ———: **Title In Another: Notice: Limitations.** The title was in English, and his daughter was in possession clothed with powers of an apparent owner and exercised those powers by leasing the land to tenants and enjoying the usufruct. Plaintiff, with English's knowledge and consent, agreed by parol with her to construct a ten-rail fence around her cultivating land, if she would grant him a private roadway through her land, and the fence was constructed. Thereafter English died and devised the land to her. She sold to Burford and he to defendant. Burford bought with actual knowledge of plaintiff's claim, so did his grantee, the defendant. Plaintiff had been in uninterrupted possession of the roadway for fourteen years when defendant fenced it up. *Held,* the Statute of Limitations ran against English, his daughter, Burford and defendant, and ran continuously from the beginning, and judgment is rendered for plaintiff.

Appeal from Cape Girardeau Court of Common Pleas.
—*Hon. B. F. Davis,* Judge.

REVERSED AND REMANDED (*with directions*).

*Oliver, Oliver & Oliver* for appellant; *Linus San-ford, pro se.*

The road was used, worked and occupied in every way a road could be from the date of the purported contract in 1889 to the fall of 1905, continuously, under claim of right, and the appellant has acquired a perfect easement of way by prescription. A right to a private way acquired by adverse user is a vested right, and not a license. Washburn on Easements (3 Ed.), p. 135; Powers v. Dean, 112 Mo. App. 288. 2nd. The road was fenced off, open, worked and used by the public and this respondent during the lifetime of English, under the purported contract, and without any objections from him for six years prior to his death, while this fence was necessary to protect his farm. Then English and all claiming under him, with notice, are estopped from claiming said strip of ground. The statute commenced to run during the life of English, and his death and vesting of the estate in Mrs. Baldwin did not stop it. State v. Macy, 72 Mo. App. 427. 3rd. Where a party spends money and labor in consideration of the license, the same cannot be revoked, and especially in this case, after sixteen years. Powers v. Dean, 112 Mo. App. 288; House v. Montgomery, 19 Mo. App. 171; Baker v. Railroad, 57 Mo. 265; School District v. Linsay, 47 Mo. App. 134; Gibson v. St. Louis A. G. M. Co., 33 Mo. App. 165; Chiles v. Wallace, 83 Mo. 85.

*Wilson Cramer* for respondent.

(1) There never was a conveyance of the strip of ground occupied as a lane and its use, as shown, was simply permissive. The owner of the land had the right to revoke the license at any time. (2) Mrs. Baldwin, being without title, could not bind the estate

by any agreement she might make. Her conveyance after she acquired title under the will of her father, in 1895, amounted to a revocation of the license she had given. (3) The evidence utterly fails to establish an easement by prescription. There is nothing to show that plaintiff was undertaking to hold the strip adversely to the owners of the land. For aught that appears he always recognized the rights of the several owners. Anthony v. Building Co., 188 Mo. 704.

LAMM, P. J.—Suit to establish a right in plaintiff to a private way in Cape Girardeau county, and to remove obstructions put in the way by defendant. The ultimate facts relied on to show a user as of prescriptive right, or adverse possession under a claim of right, are set forth in the petition with sufficient particularity to permit the proof put in. As no point is made on the sufficiency of the petition, it will not be further noticed.

The answer raised the general issue.

Judgment for defendant. Plaintiff appeals.

There is little or no dispute on material facts. In 1889 plaintiff owned a body of timber land (the rise of one hundred acres) in section 30, township 32, range 13, with no access to it by public road or private way. A half mile east, following the meandering of Hubble Creek, ran an old north-and-south public road known as the Jackson-and-Pocahontas road. Between that road and the south part of plaintiff's woodland, lay a tract of cultivating land we will call A. North of and bordering A, between the north part of plaintiff's land and said public road, lay another tract we will call B. There was an east-and-west partition fence between A and B. At that time one Flynn owned tract B, and Nannie E. Baldwin, the daughter of Thomas W. English, was in possession of tract A. Whether she was covert or discovert at the times in hand is dark. As a matter of fact she seems to have claimed the land,

but the legal title was in her said father. She did not reside on it but for several years, by her father's consent, occupied it through her tenants and, with his consent, exercised acts of proprietorship over it, contracting with relation thereto, and enjoyed the rents and profits. She was commonly reputed to be the owner and Sanford thought she was. Evidently she held the land under some domestic arrangement not fully developed. Whether by a gift resting in parol accompanied by possession, or whether it was turned over to her because of, or anticipating, a will devising the land to her, or some undisclosed contract, we do not know. At any rate, about five years later Mr. English died. At that time it was found he had made his will giving Nannie tract A.

In 1889 the party fence between tracts A and B had run down at the heel through decay and inattention. Lured by growing crops and a broken fence, the Flynn stock trespassed on the crops of Nannie's tenant and wrangles and squabbles sprung up between the Flynns and her tenant, Fullenwider. At this immediate time Sanford was clearing his woodland to make a farm of it and desired a right-of-way opening it to the Jackson-and-Pocahontas public road. To that end he opened negotiations with Nannie, thinking her the owner of tract A, and made a proposition to her to furnish the labor and material for a ten-rail fence in consideration of a private way thirty feet wide and half mile long off of the north end of tract A, running from his woodland to said road. The proposition was accepted by her. There is evidence indicating it was considered by her and her friends, including her father, a good proposition, in that it would furnish her protection against the ravages of the Flynn stock, fence tract A securely in and keep the cows out of her corn. Accordingly, she instructed her tenant, Fullenwider, to stake out a strip a half mile long and thirty feet wide off said north end and act in her stead in accept-

ing the fence Sanford was to build as per contract. Presently, at his own expense in labor and rails, he built a new ten-rail fence on the line marked off by Fullenwider, "every corner locked" or "cross-railed." We assume it was an old-fashioned, "stake-and-rider" worm fence. Mrs. Baldwin testified that Sanford was to furnish all the rails but failed to do so, using some rails out of her half of the old partition fence. As she did not live on the place, the record indicates that her testimony in that behalf was not based on personal knowledge. *Contra*, there is substantial evidence from her tenant, Fullenwider, and from parties who built the fence for Sanford, that he furnished his own rails from his own land, fully performed his contract, and that Fullenwider accepted the fence. There is other uncontradicted testimony to the effect that a thirty-foot lane was then opened, fenced on both sides and remained an open, used lane from 1889 until a year and a half before the filing of the petition in this cause, August 29, 1905, say, fourteen years. The negotiations between Sanford and Mrs. Baldwin seem to have been conducted by correspondence (now lost) and the contents of letters were proved by parol. Fullenwider testified without contradiction that the old line fence was very bad; that when he rented the farm from Mrs. Baldwin the poor fence was objected to by him; that she promised to fix it but did not; that the Flynn stock jumped in and annoyed him; that in September, 1889, (quoting), "she wrote me that Mr. Sanford had made her a proposition that he would build her a fence if she give a road through here, she asked me what I thought about it, in a letter." In response to that letter he told her "it would be a very good thing because they were wrangling about the stock." He further testified: "I know Mrs. Baldwin was to give Mr. Sanford thirty feet of land through there for that fence and I know that because I had letters from her." Again, he testified: "She wrote me that if Mr. San-

ford would build her a good fence, ten-rail fence, . . . for me to stake off thirty feet, which I did, and for me to receive the fence. Mr. Sanford built the fence according to contract and I received it and wrote to her.''

There was other testimony, substantially uncontradicted, to the foregoing effect, and we think it satisfactorily established that in consideration of Sanford's building the fence to protect her tenant's crops and inclose her own land for renting and cultivation purposes, Mrs. Baldwin agreed to give and did give him said roadway from his woodland to the Jackson-and-Pocahontas public road.

It seems after the lane was open and in use, Sanford discovered the legal title to the strip was in Mr. English. While on the stand and being examined in chief, it was sought to show the substance of a conversation between the two. Objection was lodged against this testimony (English being dead) and sustained. Subsequently, on cross-examination, it cropped out that when Sanford went to English, he, English, told him to use the road and keep it in repair; that Flynn (quoting) ''ought to have given part of the lane but it was the best thing Nannie could do;'' further, that when Sanford found out that Mrs. Baldwin was only to get the land at Mr. English's death, and, as said, went to see him, he, English (quoting), ''laughed and said the road ought to be through there and that none of them would interfere with me.'' We think the testimony establishes that from 1889 up to the time the road was closed by Kern, Sanford on all occasions kept the roadway in repair by working it and repairing a bridge thereon (except that the Flynns helped a little in working a part of the road at a certain time).

There is no testimony on the value of the thirty-foot strip of land (something less than two acres), in 1889; nor as to the cost at that time of making and hauling rails and building a good ten-rail fence one-

half mile long.   There is nothing to show it was not
a fair trade on an adequate consideration passing.
The testimony indicates that the title to the fence,
when built and accepted, was to be in Mrs. Baldwin,
that she treated the fence as her own and that the ti-
tle thereto passed to her grantees hereinafter men-
tioned.   Nothing was said about Sanford keeping the
fence in repair.   Such repairs seem not within the
scope of the contract.   Accordingly, he did not repair
it.   All the testimony shows it remained a fair fence
down to a short time before the road was closed.   Some
of the testimony shows it was a fair fence at that time
but there was testimony it was then out of repair.

The main question in the case turns on whether
Sanford's use of the road was under a revocable li-
cense, i. e., merely permissive and in a neighborly way,
or whether his user was of right and his claim adverse
under his executed contract.   It will, therefore, be not
amiss to set forth the testimony with more particular-
ity.   There is no dispute but what Sanford and his
tenants and those having business with them or on his
farm, used the road openly and continuously for four-
teen years or thereabouts without any question raised
as to the right of such use by the owners of tract A.

Sanford says, among other things, that his propo-
sition in writing to her was that he would build a half
mile of fence and furnish all the material "if she would
give me a roadway;" that the fence was the considera-
tion for the road; that his proposition was accepted
and performed; that the road, when opened, became
his only way to market his wood and farm products;
that before Kern bought tract A he came to see him,
Sanford, about buying Sanford's said land and inquir-
ed "how he could get out if he bought it."   Thereupon
Sanford told him plainly of the lane and that he had
bought it and paid for it and had a right of way there.
Sanford further testified in effect that he always claim-

ed it as a private way as of right after he had built the fence and opened the lane.

One Green testified he was a tenant on Sanford's land and hauled a great deal of cord wood over the road to Jackson, and that Mr. Sanford had him work the road and keep it in repair for the eight or nine years of his tenancy. Bolinger, Sanford's succeeding tenant, testified the same way.

Mrs. Baldwin testified she did not "sell" the strip to Sanford and gives her reason for not selling it in these words: "No, I did not sell it, because at the time I did not own it." She admits, however, that Sanford wanted a roadway, that he offered to open up the road at his own expense and build the fence and says, (quoting), "I consented to allow the road to be opened under those conditions, that he bear all the expense of making a good fence *so as to fence the farm on that side.*" Being inquired of whether there was any "consideration," she answered: "Well, there was no money paid in the matter . . . nothing . more than the building of the fence and opening of the road." She says there was nothing said about the time the road was to continue.

The land having been devised to her by her father's will, probated in 1895, she sold it to one Burford by a deed of April 18, 1896, by a description including the lane. Burford held the land for three months and sold it to one Clippard by a similar deed. Clippard owned the land about a year and transferred it back to Burford. Burford then held it about two years and conveyed to the defendant Kern.

Burford was not put on the stand, but Clippard was by defendant. He testified that the corners of tract A were pointed out to him before he bought; that he saw the lane in use; that it was a fenced lane then open and being traveled by Sanford and his tenants; that the corners of tract A included the Jackson-and-Pocahontas public road, as well as the lane, and

there was no reservation in his deed in regard to either; that when he sold back to Burford the lane was still open and being used just as he saw it before he bought.

The defendant Kern testified in his own behalf to the effect that he bought the land from Burford in 1899 and moved on it; that Burford pointed out the corners to him; that these corners included the lane and that he understood he was buying the lane. He admits, however, that Burford told him "Mr. Sanford used that lane." He testified that about three years before the trial (Sanford then having used the lane for several years during Kern's ownership) Sanford wanted to buy a road on his, Kern's, south line, and in that connection, he, Sanford, (quoting), "told me I could close up that lane over there, it belonged to me anyhow." As we gather, this last conversation was after the road had been obstructed and litigation was brewing or had commenced. On cross-examination he admitted that Sanford's proposition relating to closing up the lane was conditioned on Kern's selling him a shorter and more convenient road on the south side of tract A. He further admitted that when he bought from Burford, Burford told him that Sanford had "fixed a fence through there and is using the road;" further that Sanford had tried to sell to him before he bought from Burford and had told him in response to his question, how he would get out of there, that he, Sanford, "claimed the road," and that the lane so claimed by Sanford was open until he, Kern, and Flynn closed it. He also admitted that while his understanding was that he got the lane because his deed included it in the description of the land, yet that the same description included the Jackson-and-Pocahontas public road. Further along he admitted that when Sanford talked about buying a road on the south, he, Sanford, told him that if he "shut up the lane, he

223 Sup—40

would make trouble for him," and reiterated on cross-examination that Mr. Burford had told him before he bought his land, that Sanford had that fence put there and had the right to that lane; that Sanford told him before his purchase from Burford, that he, Sanford, had the right to get out through the lane.

Being on the stand in rebuttal and under cross-examination by defendant's attorney, Mr. Sanford reiterated that he had all along asserted his right to the road, and had claimed to own it as against English, Mrs. Baldwin, Burford, Clippard and Kern.

Plaintiff asked and was refused instructions based on his theory of the law. Defendant asked none. Considering the instructions immaterial to a decision here, they are omitted.

Any other necessary facts will appear in the opinion.

(a) The law of easements is applied to work out justice in cases differing so widely in essential elements that it may be well at the outset to get at the concrete case here by a process of exclusion. For instance as shown by the record, this is not a case where an easement, resting in a mere permissive license without any consideration passing and having for its basis a mere act of neighborly good will, is sought to be enforced. Nor is it a case where an easement is not claimed *as of right* and where the user was not of right. Such cases, therefore, as Pitzman v. Boyce, 111 Mo. 387; Field v. Mark, 125 Mo. 502 and Anthony v. Building Co., 188 Mo. 704, are not in point.

Plaintiff's case at bottom rests on prescription, that is, on adverse user as of right, openly and uninterruptedly, for more than ten years. The blunt question, then, is: Do the record facts make such a case? We think so.

(b) In the first place Sanford's claim to an easement originated in contract. He was not an interloper, squatter or mere trespasser. This is important

as furnishing a foundation for a claim of right, because the Statute of Limitations, borrowed to effectuate prescriptive rights, can only be invoked by a person claiming by right and not by wrong. No flux of time will ripen a bad title into a good one unless possession is blessed by a claim of right.

In the second place, the contract was *executed,* that is, performed and the contract consideration passed—the lane was opened, the fence built and accepted.

In the third place, the consideration was adequate in law, *viz.,* a fence built by plaintiff for the benefit of Mrs. Baldwin and a detriment suffered by Sanford by furnishing the material and outlay in building that fence in return for a benefit conferred on him, to-wit, a private way from his timber land to the Jackson-and-Pocahontas road. For aught appearing here, the consideration paid was equal or more than equal to the value of the strip of land, as prices ranged in that region in 1889.

It is argued for respondent there was no benefit to Mrs. Baldwin, that the whole affair from end to end was simply the gracious bounty of a neighbor—a permissive license revocable at will. But the record does not permit us to take that view of it. Her rents and profits were in danger from the Flynn stock. The rental value of her holding evidently was impaired by a bad partition fence. Now, breachy stock and a low or broken line fence are the devil's own invention for discords and squabbles between coterminous proprietors—a fecund womb of a miserable brood of infelicities, *viz.,* bad blood, bickering, bloodshed, fuss, litigation. In this case some of those things were present. Accordingly, for the good of her pocket and peace of mind, she gave the roadway in return for a fence, presumably horse-high, bull-strong and hog-tight, as the saying runs.

Again, under that contract fully performed, pos-session was turned over to Sanford. That the neigh-bors used this open lane when they liked in no way impairs his possession of right. Such acquiescence on his part did not destroy his easement. Such use is usual and is recognized by our statute, in ways of necessity. [R. S. 1899, sec. 9468.] The possession Sanford took and held was not the possession a proprietor would take and hold of his meadow, cornfield or dooryard, but it was the possession usually taken of an open lane, cut off on both sides by fences, bridged where neces-sary, kept fit for use by annual repairs and used con-tinuously by him, his tenants and those having busi-ness on his land, as his means of egress and ingress— his market road. It was the best possession the sub-ject-matter was susceptible of. The user was confess-edly open, notorious, continuous and without a word said or finger lifted in antagonism to it, until defend-ant, after the flight of fourteen years, built a fence across the lane and visibly asserted a hostile right to the strip.

(c)  Was Sanford's use under an adverse claim of right? We think so. The reason of the thing is that a claim of right, in essence, rests in *intent*. As there is no window through which we may look into the soul of a man and use our eyesight in spying out his intent, the proof of intent, *ex necessitate*, rests in acts and words. There may be cases in which acts speak louder than words—where the thing done drowns out the thing said. But in this case the acts of San-ford unmistakably point to a claim of right in the way. So, the things said by him point in the same direction. He claimed the road as of right whenever a question was raised relating to his right during the time he was using it. Not only so, but his claim was recognized by the owners of tract A. We find no difficulty with the case on that score and unless something else is in the way it must be said that he asserted his adverse

right to the road by acts and words continuously for more than ten years, accompanied by uninterrupted possession for that time.

That a prescriptive right is, by a fiction of the law, deemed to rest in a grant, or lost deed, as the old learning teaches, is of small significance in modern jurisprudence; for it is settled law that the right to a way by prescription may be established in the same way as the title to land, to-wit, by adverse possession under a claim of right uninterrupted for ten years.

Says GOODE, J., in a well-decided case (Power v. Dean, 112 Mo. App. 1. c. 297): "As she executed no deed, the argument is that an easement, or right to use the strip as a private way, was never granted, because such a grant must be by deed. This proposition is sound too. But an easement in the nature of a private way may be acquired by prescription or ten years' adverse use, which is equivalent to a grant. In most cases the law allows the prescriptive right on the fiction of a prior grant of which the evidence is lost. In this case a fictitious grant need not be presumed, as there is proof of a futile attempt at an actual grant. Old theories about prescriptions and presumed grants, though still alluded to in opinions for the sake of seeming consistency, don't have much force in modern law. The question of a prescriptive right depends on adverse use for the limitation period. [House v. Montgomery, 19 Mo. App. 170, 179; Pitzman v. Boyce, *supra.*] A right to the private way acquired by adverse use is a vested right and not a license. [Autenrieth v. Railroad, 36 Mo. App. 254, 260.]"

The learned judge's formulation of the law is acceptable to us and is in accord with modern doctrine.

(d) There is a further doctrine comporting with reason and justice and recognized as clear equity, viz.: that a license to use a way or an easement though without consideration at its inception, may not be re-

voked at will where, from the very nature of the license, the licensee was expected to go to great expense in order to enjoy it and where that expense has been incurred. In such case equitable estoppel arises and the relations of the parties may not be severed and the easement destroyed at the whim and by the act of the licensor alone—they must be severed, if at all, on equitable principles. [Railroad v. Railroad, 222 Mo. 461; Baker v. Railroad, 57 Mo. 265; Fuhr v. Dean, 26 Mo. 116; Chiles v. Wallace, 83 Mo. l. c. 92 et seq.; School District v. Lindsay, 47 Mo. App. 134; State v. Macy, 72 Mo. App. 427; Gibson v. St. L. A. and M. Assn., 33 Mo. App. 165; House v. Montgomery, supra.]

(e) In arriving at the conclusions announced, we are not unmindful that Mrs. Baldwin did not have the legal title to the land at the time she contracted with Sanford. She was in possession, clothed with the powers of an apparent owner and exercised those powers by leasing the land to tenants and enjoying the usufruct. We think she was allowed to deal with it by her father. He seems to have had knowledge she was dealing with it by contracting in relation to it and this with his acquiescence and consent. The evidence is clear that Sanford thought he was dealing with the owner when he contracted with her. Burford, Clippard and Kern are subvendees holding under her. They bought the land with notice of Sanford's claim. We deem it sound doctrine that they were put upon inquiry when they saw an open fenced lane in actual use by Sanford and his tenants and are charged with the facts inquiry would reveal. But, and this is closer to the point, Kern had actual notice of Sanford's claim. Burford told him of it and Sanford told him of it before he bought. Under such circumstances the running of the Statute of Limitations flowed on in an even, uninterrupted current. Under the facts of this record it would run against English, had he lived and sued

after fourteen years and, *a fortiori*, would it run against Mrs. Baldwin and those claiming under her.

We hold the ten years ripened Sanford's right to an easement and that it became vested in him.

The premises considered, the judgment is reversed and the cause is remanded with directions to enter one establishing plaintiff's easement in the strip of land described in the petition and decreeing that defendant remove his obstructions out of the way. The case made is not directed to the proof of any amount of damages. The judgment, therefore, should be entered for nominal damages of one cent and costs. All concur.