R. G. BENSON, Erma Nell Benson, his wife, Elizabeth D. Henry, Catherine H. Stewart and Louise H. Franciscus, Appellants,

v.

Thomas F. FEKETE and Pearl L. Fekete, his wife, Respondents.

No. 51923.

Supreme Court of Missouri, En Banc.

Feb. 12, 1968.

McCormick V. Wilson, Jefferson City, for appellants.

Hendren & Andrae, by John H. Hendren and Alex Bartlett, John M. Dalton, Jefferson City, for respondents.

PRITCHARD, Commissioner.

In this suit to quiet title to an easement of ingress and egress over a dead-end alleyway in plaintiffs, and to enjoin defendants from interfering with plaintiffs' use thereof, and for an order that a fence erected by defendants be removed, the judgment below was for defendants.

The alleyway in question is in Jefferson City, Missouri, and is to the rear of defendants' building. The entrance to the alleyway is from a public alley sometimes referred to as "Hog Alley," which runs in an east-west direction from Madison Street, which is a north-south public street. "Hog Alley" abuts defendants' property on

the north. The following plat, used by the parties during the trial, shows the dimensions and relationship of the properties affected by the judgment:

Referring to the plat, Tract (1) is that owned by defendants, the Feketes. Tract (2) is owned by plaintiffs, Elizabeth D. Henry, Catherine H. Stewart and Louise H. Franciscus, who in the transcript are called the "Henry girls." Tract (2) is occupied as tenants by the plaintiffs, Bensons, as a cafe, known as "The Towne Grill." Tract (3) is owned by the Bensons and used by them as "The Esquire

Lounge," a bar or tavern. Tract (6) is a vacant space behind (and to the east of) the building located on Tract (2). Tract (8) is also a vacant space abutting the northerly side of the building located on Tract (3), which has a doorway leading onto Tract (8). Tract (7) is not involved in this suit, being a building which abuts Tracts (5) and (8).

The issue is whether the evidence and applicable law show that plaintiffs and their predecessors in title acquired a private easement by prescriptive use to pass over Tract (5), also owned in fee simple by defendants, for access to the rear entrances to their buildings [Tracts (2) and (3)].

The following facts were stipulated by the parties: The common source of title to Bensons' property [Tract (3)] and defendants' property [Tract (1)] was the Tribune Printing Company, a corporation, which conveyed by warranty deed these two tracts, respectively, on September 17, 1885, and October 31, 1891. Plaintiffs claim an easement over Tracts (5) and (8), 10 feet east to west by 43 feet 9 inches, more or less, north to south. The Feketes purchased Tracts (1) and (5) on February 23, 1965, from Juliet Price Idol. A remainder interest in Tract (2) was conveyed to the Henry girls on December 11, 1956, after a life estate of Donald D. Henry (since deceased). The deed thereto makes no reference to any easement or right to use Tracts (5), (6) or (8).

Tract (2) was originally conveyed to L. D. Gordon on April 11, 1896, by the Tribune Printing Company, with "the right to use, occupy and enjoy, jointly and in common with the grantors herein and its assigns perpetually the piece of ground immediately in the rear of the property herein conveyed being 12 feet wide from the north to the south and 8 feet long from the east to the west." [This is Tract (6).]

By a mesne conveyance one Solomon Houck McHenry and wife, Thenia, con-veyed to Elizabeth W. Henry (who was Donald D. Henry's spouse and the mother of the Henry girls) Tract (2), with the grant "also the right to use, occupy and enjoy jointly and in common with Cecil W. Thomas (Thomas Building) or assigns perpetually the piece of ground herein conveyed, being 12 feet from north to south wide and 8 feet long from east to west as conveyed by the Tribune Printing Co. to L. D. Gordon, Record Book 18, page 529." [The quoted portion is Tract (6).]

The source of title of Juliet Ada Price Idol (who conveyed Tracts (1) and (5) to the Feketes as aforesaid) was by a decree of the Cole County Circuit Court dated May 29, 1953, terminating a trust estate created by the will of Caroline V. Price, deceased, which will vested title in Juliet Ada Price Idol as remainderman. The Price trust estate acquired title to Tracts (1) and (5) by virtue of trustees' deeds from the Sheriff of Cole County dated August 3, 1929. After defendants purchased Tracts (1) and (5) from Mrs. Idol, they erected a fence across areaway (5) (as shown by the photographs) at the southeast corner of the building located on Tract (1). On May 12, 1905, Mattie C. Ewing conveyed to Cecil W. Thomas Tracts (1), (5), (6), (7) and (8), reserving to L. D. Gordon his heirs and assigns, the use in common with others, in the language of Gordon's deed, Tract (6).

The Bensons have leased Tract (2) from the Henry girls since April 1, 1950, and the lease contains no reference to an easement over the Tracts (6), (8) or (5). They purchased Tract (3) on January 9, 1964, from Fred H. and Alma B. English, and neither that deed nor any subsequent to the conveyance (in 1885) from the Tribune Printing Co. contains any reference to an easement over Tracts (5) and (8).

Joseph G. Downs Co. leased Tracts (1) and (5) starting June 3, 1950, for one five-year term from the C. V. Price Estate, then two five-year terms from Juliet Price Idol,

ending June 2, 1965. The leases, unrecorded, contained the language: "together with the right to use the alleyway immediately to the rear of said building jointly with and consistently with the use of said alleyway by the owners or occupants of a building immediately adjacent thereto and southerly thereof."

Juliet Price Idol paid taxes upon and maintained Tract (5), and plaintiffs and their predecessors in title have at no time paid any taxes or assessments on the Tract (5) property.

The testimony adduced by plaintiffs (the Henry girls did not appear or testify) is this: Ed McKenna was formerly the manager of an express company, since 1905 or 1906. The building on Tract (1), originally three stories, was leased to the Postal Telegraph Co., by Cecil Thomas. The building burned and Thomas built the present one-story building, the north one half of which was occupied by the Pacific Express Co. The strip of alleyway in question [Tracts (5) and (8)] was there in 1906 when McKenna commenced working there—it was an open range, no fences or anything. The building had rear doors (Postal Telegraph and the express company) opening onto Tract (5). Donald Henry bought Tract (2) during McKenna's occupancy, who left in 1922. Mr. Pope had the Oak Bar in the building on Tract (3). Donald Henry and others [to the south of Tract (1)] used the alley to some extent, McKenna didn't know how much, but the public used it. "If you wanted to enter their place of business from the rear, you had no trouble doing it." McKenna himself had gone into their places from the rear. The "public" was using the Oak Bar rear entrance to purchase merchandise, and this continued all the time McKenna was there, from 1906 until 1922.

Fred Betts had been familiar with the alleyway, Tracts (8) and (5) since 1915, when he was working for the express company driving a wagon. Pope had a back door on the Oak Bar [Tract (3)]; Shry-

ack-Hirst had a grocery wholesale house with a platform on Tract (7), and "they" would bring their beer there from Tract (3) (Oak Bar) and sit there on the platform and drink it. Betts had seen coal delivered to Tract (1), which was an express office and which had a little basement with a furnace. Max Geisler [occupant of Tract (2)] had no furnace—he got his deliveries, merchandise, music boxes, etc., for his pawnshop through Tracts (5) and (8). Customers and delivery men were using the building's rear entrance of the Oak Bar. Matt Nichols had the building on Tract (2) before prohibition (1919), as the "Golden Egg" tavern, and deliveries were made to it through Tracts (5) and (8). During prohibition, Otto Slicker and Jack Koester had a lunch counter and sold "near" beer in the building of Tract (3). They got their deliveries through Tracts (5) and (8). After repeal of prohibition Ernest (Yellow) Norwood opened the Hub Bar in the building of Tract (3), and Fred English wound up with it and put in partitions for a studio. After repeal, Johnny Neutzler and Roy Tharp tore out the partition of the building of Tract (1) and put in a pool hall for ten or fifteen years. During all the time deliveries were made over Tracts (5) and (8) to the two buildings, none (or not very much) being made through the front entrances of buildings on Tracts (1), (2) and (3).

John E. Wells commenced working with Wells Fargo fifty years ago or a little longer "hustling freight." That firm occupied half of the building on Tract (1). He was using the alleyway in question [Tract (5)] off "Hog Alley" where freight was delivered in the two places: Postal Telegraph and the express company, both occupying the Tract (1) building.

Cletus Pope, who has lived in Jefferson City practically all of his seventy-two years of life, is familiar with the building on Tract (3), the English Studio. His father owned it for years and operated a saloon, ending fifty-two years ago when he died.

His mother then owned the building in which Swillum and Slicker had a bar, after which Mr. English and the National Cash Register Company occupied it. Mr. Pope and his brother inherited the building when their mother died twelve years ago, and they sold it (to Mr. English) about five years ago. There is a door in this building opening onto the areaway marked Tract (8). Mr. Pope himself had not gone through the door; he did not ever operate a business there and did not know what use was made of the door. He never mentioned the alley to Mr. English at the time he was in the building as his tenant. The building was heated with a stove, but he did not know how fuel was brought in. On cross-examination Mr. Pope testified that while he owned the property he never claimed an easement over Tracts (8) and (5) which led out to the (public) alley.

Fred English occupied the Tract (3) building (as tenant, then owner) since 1933. National Cash Register Company occupied the half on the south. Mrs. Ida Pope was their landlady. Mr. English had an Arcola hot water furnace which burned coal and heated both sides of the building. Coal was delivered through the alleyway, Tracts (5) and (8), dumped at the back door, then carried by wheelbarrow back to their coal room. The Englishes continued to use the alleyway for coal delivery until 1946 when they converted to gas heat. They had an incinerator in the back where they and the National Cash Register Company burned trash until 1946, after which it was all hauled. Ashes were also dumped there and hauled away. The Woodman Engineering Company used to bring in their equipment to service heating and air conditioning equipment, and servicemen used the alleyway for plumbing repairs. Trash was hauled through the alleyway until the Englishes sold the building to the Bensons.

Mr. English did not ever ask anyone for permission to use the alleyway—he just assumed it was all right to use it—they used it all the time. The only other way coal

could have been delivered was through the front door (fronting on Madison Street), which would not have been very feasible. He did not ever talk to anyone about who owned Tracts (5) and (8), and he had no trouble getting it cleared for his use and no one ever tried to stop him.

On cross-examination Mr. English testified that after he converted the furnace to gas he never brought any more coal in through the areaway. The door opening out of the back of their building onto Tract (8) did not have a handle on the outside of it. He kept the door locked—the public could not come into their place of business unless he unlocked the door for them. Joe Downs, who occupied the building on Tract (1), kept his car or some vehicles connected with his business in the alleyway [Tract (5)] part of the time. When Mr. English took out his trash he would have to go back by the parked cars to the public alley where the trash truck was stopped. He got merchandise for his business (a studio) through the front entrance to his building, on Madison Street, and the public used that entrance. He sold the property to the Bensons in 1963, and conveyed by deed, but he did not sell them any easement over Tracts (5) and (8). He used the areaway, Tract (5), to carry out trash for the last ten or fifteen years, with Downs' consent, "but there was never any word about it. We just assumed we could use it." He did not claim any property right in Tract (5); did not pay any taxes on it; and except to keep it cleaned up, he did not gravel it or maintain it in any way. It was the area right behind the Towne Grill [Tract (6)] where he kept their trash barrel and ash containers. He did not ever park his car back there.

Al Schatzer was for eleven years with the Jefferson City Police Department, 1922 to 1933. From 1934 he drove beer delivery trucks, and knows Tract (5). It caused him some grief several times when he would "Get a call to Hog. Alley for a drunk or some disturbance, and they would run back in this alley—and there was cars parked,

and you would have to go back there and hunt them." He would always come in the alley to make deliveries to "Yellow" Norwood. Sometimes there would be a truck there and they would have to park in the (public) alley and roll the half barrel up to the back door of the Hub Bar. The public was using Tracts (5) and (8) at all times for deliveries from 1922 on, when he first knew it was there. On cross-examination Mr. Schatzer testified that everybody used the alleyway and sometimes he had a hard time getting in there.

Oliver Schnieders (now with the State Highway Department) drove for the Ramsey Supply Company making deliveries of Budweiser beer through Tracts (5) and (8) from 1934 to 1942 to the Hub Bar, "run by Ernest Norwood," and to Neutzler and Tharp who ran a pool hall in the building of Tract (1). He could never get his truck into the alleyway. He drove to it and carried the beer in on hand trucks.

Wilfred H. Kraus has been driving a beer truck for the Falstaff distributor, except from 1952 until 1959, since 1936. He made deliveries through Tracts (5) and (8) to the old Hub Bar on Tract (2). There was a delivery door, a small shed, and another door into the place. One could go in either front or back but most of the time they (he) preferred the back which was closer and there were "empties" there. On cross-examination he testified that it was over twenty years ago since he had delivered any beer through Tracts (5) and (8).

William Sommerer also delivered beer for the Ramsey Supply Company over Tracts (5) and (8) from 1945 through 1946. Sometimes he backed the truck in the alleyway and a lot of times he parked it in the (public) alley and wheeled or carried the beer in. He could not be positive or recall that he saw other people making use of the alleyway for deliveries, but nobody ever tried to stop him from using it. On cross-examination it was elicited from him that he did not recall delivering anything over Tracts (5) and (8). He delivered draught beer through the front entrance to the Hub Bar.

Virgil McCubbin hauled trash and coal ashes from 1937 until 1948, with customers on Madison Street—Fred English and Neutzler and Tharp. No one ever tried to stop him from using the alleyway. He had trucks which backed clear up (in the alleyway) to get trash. Cross-examination revealed that Mr. McCubbin had not hauled anything from the alleyway after 1948.

R. G. Benson, one of the plaintiffs, testified that he has been in business at the Towne Grill, 221 Madison Street, Tract (2), for sixteen years. The lease started April 1, 1950, the business thirty or forty days later. He has had continuous occupancy of the site since that time. The building [of Tract (2)] is 12 feet wide, with a back bar, grill and steam table, and a passage for help and a counter for customers with 19 stools for them to sit on. The range is in the rear part along with a baker's table, rest room and dressing room. There is also a garbage room to the rear, 8 feet wide and 12 feet deep, in which is located a compressor and ice maker. Off this room is one large door and two small doors opening onto Tract (8). There is a common wall between Tracts (2) and (3), the latter of which has a doorway leading onto Tract (8). Prior to the fence [on Tract (5)] being erected practically everything came in the back door except the customers of the Towne Grill—a few of them did, coming down Tracts (5) and (8) and in the back door on Tract (6), the same route that deliveries would follow. Trash and garbage were always taken away through the rear door—never any other way. There were several different companies hauling trash and garbage, and they all made access/exit through the rear door. Mr. Benson and his wife purchased Tract (3) in 1963 and took possession in 1964. He is the tenant of the Henry girls of Tract (2), and he negotiated with their father when their mother owned it.

Mr. Benson has made improvements in the area of Tracts (5) and (8), to the wall of Tract (6), installed an exhaust fan on Tract (2), and added a canopy and dumped concrete there when he found people were getting muddy when they ran in the back door. At one time he had a sign on it (the back door), "Mel's patio."

Mr. Benson and Mr. Downs (or an employee) took a hammer and broke down a window well behind Tract (1), which stuck out into Tract (5) four inches, so they could roll cars in. Mr. Benson would put his car in first, then Mr. Downs, and they had to throw gravel on the alleyway for which they split the cost. Trucks continually knocked down the downspout on the Shryack-Hirst building which was there when Mr. Benson moved to Tract (2) in 1950, and Tracts (5) and (8) are in the same shape as they were in 1950. Mr. Benson's manager, Melvin Erhardt, parked his car south on Tract (5) constantly because he got there at 6:00 o'clock in the morning and Joe Downs [occupant of Tract (1)] would not get there until 9:00 o'clock. When they would want to move their car Mr. Downs would pull out so they could get out, and when Mr. Benson honked his horn "Joe would come out, raising Cain, and move out."

Mr. Benson never asked permission to use the alleyway, Tracts (5) and (8)—he did not know who to ask. No one ever came up to him and voluntarily gave him permission to use it. He used the alleyway as a part of the building he was renting, the Towne Grill. No one made any attempt to interfere with his use of the area, going across it. He would block it when remodeling and use it to the fullest extent, cleaning it up "and all." He could see Mr. English using it with workmen's trucks. He kept a trash can with "English" printed on it, and garbage men would carry trash across Tract (5) into their trucks. All made free use of Tracts (5) and (8) to their buildings from the public alley.

After Mr. Benson purchased Tract (3), and took possession on January 15, 1964, he used Tract (5) as everyone else did, publicly filled it full of debris when he remodeled the building, with pipe 30 and 40 feet long. He intended to use Tracts (5) and (8) as the Englishes had. He asked Mr. English, "Do you have the right to use this alley?" And he said, "We have always used it."

On May 28, 1965, a fence was erected on Tract (5) after the Feketes bought the building. Mr. Fekete said something about his going to build his building back to the building directly east of it. Mr. Benson then said, "Why, how can you do that?" To which Mr. Fekete replied, "It's mine." Benson said, "Yes, but we have been using this thing, the whole thing belonged to this thing." Mr. Fekete then said, "I'm going to build my building back," to which Mr. Benson rejoined, "Over my dead body." Mr. Benson then moved some pipe at Mr. Fekete's request and the fence was built which is still there.

Mr. Downs' permission was never asked by Mr. Benson to use the land, and Mr. Downs never did tell him he had permission. Everyone had used that land for as far back as the buildings had been there— "We could remember everyone wanted to use it. If English wanted to use it, we would move out and he would use it."

On cross-examination Mr. Benson testified that he had a buzzer on the back of the Towne Grill property which was open about 90% of the time. The English building had a two-way knob, inside and out, when he bought it. Mr. Benson had parked his car in the alleyway when he opened the Towne Grill in 1950, and after Erhardt became his partner Benson didn't always park his car there—he would not bother Joe Downs just to have him move his car. The area behind the Towne Grill was not long enough to park. The lease on Tract (2) did not cover Tract (6).

For defendants, the Feketes, Joe G. Downs testified he was the tenant under a lease dated June 2, 1950 to the end of May, 1965 [Tract (1)], where he operated an office machine and furniture business. He parked in the area of Tract (5), and if he was not there his men had access to it, and rarely did a service truck come in and work on refrigeration "or something," and that was on a very temporary basis. Food men walked in mostly—they did not park their trucks in there. Mr. Downs used the alleyway from the time he moved there, in 1950, up until he moved out in 1965. Benson would park up in the alley and walk through occasionally, and Erhardt went through the front most of the time. Mr. Downs never saw Erhardt "practically ever" come out of the back. "Garbage did come out of there, so apparently it must have been in there, by coming across Tract (5)—the garbage truck was in the alley."

Mr. Downs never gave Mr. Benson permission to go through there to take his trash. "He (Mr. Benson) claimed an easement." Mr. Benson never asked him whether he could go through there, to move his car so he could get in. It was Downs' parking place. "Sometimes, early in the morning, when they had cause for a service truck, they might get in ahead of me, but I never let anybody get anything started on that taking that away." Erhardt had his car stuck away up in there, and two short cars could do that—"He might be back over here, so many feet, over behind my store. He did that once in awhile, but nothing regular about it." In fifteen years, if Erhardt was parked back there, he didn't ask Downs to move more than two dozen times.

Delivery people would walk through— "They carried boxes or lugs or whatever that stuff is packed in." They would walk through while Downs' car was parked in there, "to one side of the other." When Mr. Benson would come to deliver stuff in there, he was pretty good, but he wasn't too good there for awhile. "He blocked it. I had to put up a sign there, and he got to

where he moved up here and he walked around." The sign was put up more than two or three years ago.

Mr. Benson claimed an easement, back in 1950, and Mr. Downs rented the place [Tract (1)] to include that space [Tract (5)]. Some of the food sales people and garbage people went through the back door of the Towne Grill. Mr. Downs never saw any merchandise delivered into the English building through the areaway.

On cross-examination Mr. Downs testified that "any privilege they had coming up there was only occasionally and at my permission." Permission "came from the original negotiation of the deal with John Guy Gibson."

J. W. Hobbs, who has been in the real estate business since 1923, represented Mrs. Juliet Price Idol and advised her concerning the lease of Tract (1). At the time of trial Mrs. Idol was at home, after serious surgery at Barnes Hospital, where no one could see her and she did not answer the telephone. The 1960 lease of Tract (1) was copied from the previous lease with an increase in rental, with the description the same, for which he did not know the reason. There were no conversations about it as far as Mr. Hobbs knew. He testified there were other buildings in the vicinity which had no rear entrances, and some had areaways used by people, some of which areaways were not owned by the same people who owned the store buildings. As Mrs. Idol's agent and handling her transactions, Mr. Benson nor any tenant ever said to him that they had an easement of any kind to the areaway behind the building.

On rebuttal for plaintiffs, Mel Erhardt testified that he is a partner of R. G. Benson in the Towne Grill business, which has been in the same location for fifteen years. Over a period of fifteen years he used Tract (5) a lot of times in the morning to bring in country purchases and to unload cargoes. He used the tract more when Mr.

Downs' drivers were on the road. When he was hemmed in, the drivers would move and let him out when he left at 2:00 or 2:15 p. m. For as high as three days, during remodeling of the Towne Grill, they would use the areaway. Erhardt and another cleaned the alleyway, raking it and hauling away the trash. He and Joe Downs had several violent arguments over the alleyway in which Erhardt said he had the right to use it and Downs said he did not. He did not stop using it on account of what Downs said. Downs and Towne Grill partnership each paid half of the cost of graveling the areaway, which was graveled two or three times in fifteen years. When trash was removed, Downs would let them go by his car and take out the garbage and trash barrels.

We deem that the evidence, above detailed, establishes that Tract (5) as variously owned by the owners of Tract (1) was used by those occupying Tracts (2) and (3) openly, notoriously, continuously and without interruption for not only the last ten years but for many years, going back to 1906. The record is silent as to how such use began, but it is clear that it was used for the convenience, and in connection with business operations, of the owners and tenants of Tracts (2) and (3) in carrying coal and supplies, ashes, trash and garbage from and to the public "Hog Alley." Customers used the alleyway to some extent to gain entrance through the rear doors of the buildings on Tracts (2) and (3). A portion of Tract (5) was also used for parking of vehicles, both for the occupants of Tract (1) and for those occupying Tracts (2) and (3), and the loading and unloading of vehicles was made in Tract (5) to the rear entrance of Tract (1). All this continued up to the time defendants erected the fence on Tract (5). The issue is whether, as plaintiffs claim, such use was adverse to the owners of Tract (5), or, as contended by defendants, was that use merely permissive?

Plaintiffs rely upon the well-established rule that "proof of an open, notorious, continuous and uninterrupted user for the prescriptive period, without evidence to explain how it began, raises a presumption that it was adverse and under a claim of right, or, as is sometimes stated, raises a presumption of a grant, and casts on the owner of the servient tenement the burden of showing that the user was permissive or by virtue of some license, indulgence, or agreement, inconsistent with the right claimed." 28 C.J.S. Easements § 68a, p. 736. That rule is followed in this state, Downey v. Sklebar, Mo.App., 261 S.W. 697, 699 [2]; Smith v. Santarelli et al., Mo.App., 207 S.W.2d 543, 545 [1]; Cook v. Bolin, Mo.App., 296 S.W.2d 181; Fassold v. Schamburg, 350 Mo. 464, 166 S.W.2d 571; Dalton v. Johnson, Mo., 320 S.W.2d 569, 573 [3–6], and is applicable to the facts of this case. There is another rule of aid to the plaintiffs here and that is the character of the use made by the occupants of Tracts (2) and (3) is such that it is inimical to and in nonrecognition of the title to Tract (5). "[B]ut the use of the land is adverse, as against the owner, if it is not made in subordination to him, is open and notorious and is not wrongful as to him. * * * 'Adverse,' under the definition, means that the one making the use 'shall not recognize in those as against whom it is claimed to be adverse an authority either to prevent or to permit its continuance. It is the non-recognition of such authority at the time a use is made which determines whether it is adverse.'" Jacobs v. Brewster, 354 Mo. 729, 190 S.W.2d 894, 897, 899. See also 25 Am.Jur.2d Easements and Licenses § 51, p. 460; Restatement of the Law of Property, §§ 457, 458. So, here, we rule that plaintiffs' evidence does not show, as contended by defendants, that the use was permissive only, but on the contrary—the use made, the constant carrying in of supplies, the entrance by customers to the rear, the parking of vehicles, the carrying out of trash, show an actual invasion or infringement of the rights

of ownership possessed by the owners of Tracts (1) and (5) who initially had a cause of action to prevent that use. In this connection, we rule that defendants' cited and relied upon case of Anthony et al. v. Kennard Bldg. Co., 188 Mo. 704, 87 S.W. 921, is inapplicable on its facts. There, two strips of land formed a narrow passageway for pedestrians. Defendant's strip to the rear of his building was 3 feet 1⅓ inches in width, and plaintiff's strip was to its west and was 2 feet 1¾ inches in width. It was held that the use in common with the owner (pedestrians veering off the narrow strip of land of each party)ʼ created no inference of a claim of right or adverseness, but only permissive user "in a neighborly way." Here the use made of the alleyway is of its entirety. It is not a case where a dividing line extends down through the property and rightful users of one side stray slightly to the other side. In Bridle Trail Association v. O'Shanick, Mo.App., 290 S.W.2d 401, there was evidence of a request for and refusal of permission to cross the property. In Freed v. Greathouse, 238 Mo.App. 470, 181 S.W.2d 41, the conclusion from the evidence was that plaintiff's use was always permissive. In National Cylinder Gas Co. v. G. H. Packwood Mfg. Co., Mo.App., 208 S.W.2d 825, there was an initial unambiguous (as held) grant of an easement, under which it was sought to have declared a prescriptive easement in an additional 15.95 feet, which the evidence disclosed was disclaimed when it was not included in a plat submitted by plaintiff to defendant. All these cases cited by defendants are of no aid to them. Of strong significance here is the fact that the owner of Tract (1), the Tribune Printing Company, in 1896 conveyed Tract (2) to L. D. Gordon with "the right to use, occupy and enjoy, jointly and in common with the grantors herein and its assigns" Tract (6). To reach and use Tract (6) would necessarily involve traveling over Tracts (5) and (8), and it may be asked, why would that grant be made if it were not intended that Tract (2) owners should use Tract (5) for ingress

and egress? The fact that the title to Tract (8) is in limbo, so far as shown by this record, is also a strong circumstance showing that its use, adjoining Tracts (3) and (6), was intended as a part of this sole means of ingress and egress over the alleyway in question. So also with the provisions in the Price Estate lease and those of Mrs. Idol to Joe Downs, knowing and recognizing at least some use of Tract (5) by the occupants of Tracts (2) and (3).

■ Under all of the evidence here, we hold that the use made by plaintiffs and their predecessors in title of the alleyway was adverse. The facts and circumstances, and the presumption of adverseness arising from long uninterrupted use, are not lessened or destroyed by the testimony of Mr. English and Mr. Pope that they claimed no easement. Mr. English testified that he made use of the alleyway and there was never any permission asked of anyone. Mr. Pope did not operate a business in his building and did not know what use was made of the door at its rear. In Jacobs v. Brewster, supra, loc. cit. 190 S.W.2d 894 [6], it was held that a letter written by one joint owner two years after the driveway in question was constructed did not establish a permissive use as a matter of law. It was further said, loc. cit. 190 S.W.2d 896 [3–5], "[T]he essence of prescription is use, 'such use of land, for the period of prescription, as would be privileged if an easement existed.' The test of the use, whether it has been of such character and quality as to meet the requirements of prescription, depends upon whether it was adverse, continuous and uninterrupted for the period of prescription."

■ The burden was upon defendants to prove that the use made by plaintiffs and their predecessors in title was permissive. The only evidence offered by them is the testimony of Downs that the use made was allowed by him as a matter of courtesy, and so long as the occupants of the Towne Grill did not interfere with Downs' use he allowed them to haul out garbage and

bring in supplies. But note that Downs' leases contained the clause that his tenancy was subject to the use made by others of the alleyway, and thus it follows that he had not the authority to give or withhold permission to others to use the area.

■ There is no merit in defendants' contention that evidence of use by the public cannot be utilized to prove the acquisition of a private easement by prescription by plaintiffs. While there was some use of the areaway by the public, the overwhelming weight of all the evidence here is that the principal use made by everyone was in connection with the operations of businesses by the occupants of Tracts (2) and (3), a private use. The purchase of goods by business invitees through the rear entrances of the buildings was for the benefit of such occupants and directly related to their businesses. So also with deliveries, hauling trash, ashes and garbage and rubble. It is not here contended that Tract (5) is or was a public way. Rosemann v. Adams, Mo., 398 S.W. 2d 855, citing 17A Am.Jur. Easements § 82, p. 698, is inapplicable.

■■ Nor is there merit in defendants' point that evidence of use by plaintiffs' (Bensons') predecessors in title cannot inure to the benefit of those plaintiffs because their deed did not convey any easements of such predecessors; and since plaintiffs held title less than ten years, no prescriptive rights could accrue. Plaintiffs' leases of the Towne Grill property [Tract (2)] did not make reference to any easement. In ruling this point we concurrently hold that the claimed easement over Tract (5) is appurtenant to the buildings on Tracts (2) and (3), despite the fact of intervening small areas, Tracts (6) and (8), the latter of which is apparently owned by others than the present parties. Thus defendants' cited case of Lurvey v. Burrell, Mo., 317 S.W.2d 458, holding that there must be a conveyance of adjacent property claimed by adverse possession, is not in point because as pointed out in Dalton v.

Johnson, supra, a different rule applies to an appurtenant easement. Although not absolutely necessary to ingress and egress for the buildings on Tracts (2) and (3) (they both have entrances fronting upon Madison Street), there is an element of necessity in the use of Tract (5) in the disposal of garbage and trash, and in making deliveries, without disturbing patrons using such front entrances. The fact that plaintiffs did not seek to join the owners of Tract (8) [the use of Tract (6) was originally granted to the owners of Tract (2)] does not prevent the easement over Tract (5) from being appurtenant. To make use of the easement over Tract (5), those in the buildings of the dominant tenements, Tracts (2) and (3) would necessarily have to travel over Tract (8), the terminus of this dead-end alleyway. As ruled in Dalton v. Johnson, supra, loc. cit. 320 S.W.2d 574, "The easement so acquired became an appurtenance to the dominant estate and passed to plaintiffs upon the conveyance of that land to them even though the easement was not mentioned in the deed."

■ The property, Tract (5), was held in trust from August 3, 1929 to May 29, 1953, for the benefit of Juliet Ada Price Idol, who was the ultimate beneficiary or remainderman thereunder, and to whom the instant former trust property was distributed on the termination date. Defendants say the statute of limitations did not run as against the trust remainderman, Mrs. Idol. Suffice it to say that the evidence shows that a prescriptive right in the owners and tenants of these buildings to use Tract (5) for ingress and egress arose long before the C. V. Price Estate trustees came into title in 1929 of Tracts (1) and (5). Such trustees took title subject to the openly used easement. Those uses, to the full extent to which the alleyway was susceptible, continued up to 1948. From that date to 1950, there is no evidence of use, but the fair inference is, businesses continuing in the same locations, that it continued. Defendants say that after

1950, by requests of Downs to move his vehicles so they could get out of Tract (5), the Bensons converted the use to a permissive one and abandoned the easement. There was no abandonment. Those uses, being the "best possession the subject-matter was susceptible of" (Sanford v. Kern, 223 Mo. 616, 122 S.W. 1051, 1055), continued to the time the fence was here erected.

Defendants say that Benson's lease of the Towne Grill property did not include any rights to the areaway in question, and he, as lessee, and the Henry girls as lessors, could not acquire any rights in the areaway by virtue of the use by tenant, Benson and his employees. The Henry girls did not testify as to a claimed easement.

The rule cited by defendants is stated in 25 Am.Jur.2d Easements and Licenses § 40, p. 454: "One in possession of land as a tenant at will or for years cannot acquire for himself by prescription an easement of way over the lands of another. However, adverse use of an easement over the land of a third person by a tenant under his lease inures to the benefit of the landlord so as to support the landlord's right to such easement by prescription. But this principle does not apply where such easement is not, either expressly or impliedly, within the terms of the lease." See also, for this general rule, 28 C.J.S. Easements § 8, p. 643; Anno. 105 A.L.R. 1187, where the reported case of Deregibus v. Silberman Furniture Co., 121 Conn. 633, 186 A. 553, 105 A.L.R. 1183, is mentioned for the proposition that the tenant's adverse possession may inure to the landlord's benefit where the circumstances in connection with such possession or use justify the implication that it was by virtue of the lease.

■ In this case, the evidence shows that the easement over Tract (5), being appurtenant to buildings on Tracts (2) and (3), as above held, was acquired long before the present owners of the buildings acquired their titles. See Smith v. San-

tarelli, supra, loc. cit. 207 S.W.2d 544, 545, where these distinguishing features (pointed out in defendants' cited case, Di Pasco v. Prosser, 364 Mo. 1193, 274 S.W.2d 279) to the application of the general rule, supra, appeared: owner and tenants of the dominant tenement, which had been acquired long before the owners of the servient tenement, had used the road for more than 40 years. "The use was open, visible, uninterrupted and continuous during all of that time and, in the absence of proof to the contrary, it will be presumed to have been adverse. Fassold v. Schamburg, supra." In Jacobs v. Brewster, supra, it was contended that the owner, being a former tenant, did not have the necessary ten years of adverse use of the driveway in question. The court said, loc. cit. 190 S.W.2d 898 [7–10], "True enough, the possession or use of land by a tenant is the landlord's possession and not the tenant's. But, if a tenant or a roomer in the home of an owner drives over the way and occupies the garage, does he not do so in the exercise or assertion of his landlord's right and is not that a use of the way by the owner?" Under the total circumstances of long, uninterrupted user of this areaway, not in subordination of the owner's rights, the areaway being appurtenant to and necessary to rear access to the buildings on Tracts (2) and (3), such use is impliedly within the terms of not only Benson's lease, but for any tenant of the building on Tract (3). Benson's use of the alleyway was that of his landlords'. The point here raised is ruled against defendants.

■ The last point presented is whether defendants could have, by reasonable diligence, discovered that the adjoining owners were claiming a prescriptive easement, and consequently would and did take the property (in 1965) as innocent purchasers free of any recorded easement. The weight of authority is against defendants on this proposition advanced by them. The physical features of this dead-end alleyway going all the way back to the buildings on

Tracts (2) and (3) being graveled and maintained, would show by a reasonable inspection that use was being made of it to gain entrance to such buildings. The use was apparent, was widely known, and was sufficient to charge defendants with notice that Tract (5) was burdened by an easement. 28 C.J.S. Easements §§ 48, 49, pp. 711–714; Missouri Power and Light Co. v. Thomas, 340 Mo. 1022, 102 S.W.2d 564; Drainage District No. 48 of Dunklin County v. Small, Mo., 318 S.W.2d 497, 502 [6–8]; 25 Am.Jur.2d Easements and Licenses § 97, p. 502; Annotations, "Easement-Notice-Physical Conditions," 41 A.L.R. 1442; and 74 A.L.R. 1250.

The record does not establish any right of the owners and occupants of Tracts (2) and (3) to park vehicles on or partly on Tract (5) thus burdening it, but only to use the latter areaway for ingress and egress.

The judgment is reversed and the case is remanded with directions to enter judgment for plaintiffs establishing an easement of ingress and egress from Tracts (2) and (3) over Tract (5) (but excluding the right to park vehicles thereon), and for an injunction as prayed, against the erection and maintenance of the fence blocking Tract (5).

Opinion adopted as supplemented by PER CURIAM opinion filed.

All concur and STONE, Special Judge, concurs.

STORCKMAN, J., not sitting.

## SUPPLEMENTARY OPINION

PER CURIAM.

As was stipulated by the parties upon trial, "the trustees under the estate left in trust by the will of Caroline V. Price, deceased, were the owners of [Tracts (1) and (5)] held in trust for Lawson C. Price and Celeste B. Price" during the period from August 3, 1929, to May 29, 1953, on which latter date title vested in Juliet Ada Price Idol "as the remainderman under said trust." Defendants assert that "evidence as to usage [of Tract (5)] between 1929 and 1953 could not properly be used by the plaintiffs to prove any prescriptive rights" because "the Missouri rule is clear * * * that prescriptive rights during the time that property is held in trust cannot run against the remainderman of the trust." In support of the stated contention, counsel cite Revare v. Lee, Mo., 257 S.W.2d 676, in which it indeed was said that, where a tract had been devised in trust to a third person for the occupancy, use and benefit of testatrix' nephew and niece so long as both or either should live, the statute of limitations did not begin to run against the remainderman until the death of both the nephew and the niece. 257 S.W.2d at 679(4). Four cases were cited in support of that holding, namely, Willis v. Robinson, 291 Mo. 650, 237 S.W. 1030, 1035; Falvey v. Hicks, 315 Mo. 442, 286 S.W. 385, 389; Miller v. Proctor, 330 Mo. 43, 49 S.W.2d 84, 87; Allen v. Wiseman, 359 Mo. 1026, 224 S.W.2d 1010, 1012. In each of those cases it had been held that the statute of limitations did not begin to run against a remainderman until termination of the prior life tenancy; but in no one of those cases had title been vested in a trustee during the life tenancy.

On the question presently under discussion, this court has written plainly on several occasions. In Ewing v. Shannahan, 113 Mo. 188, 20 S.W. 1065, an ejectment suit, real estate had been conveyed to a trustee for the benefit of one George W. Ewing, Jr., during his lifetime, with the remainder to his heirs. Plaintiff, Ewing's son and only heir at law, was a minor at the time of his father's death; but, having instituted suit within the permitted period after having attained his majority, he was entitled to recover unless barred by reason of defendant's adverse possession for twenty years. The court declared that "[w]hile there was some doubt at one time, the law is now well settled, both in England and in

this country, that the rule that the statute of limitations does not bar a trust estate holds only as between cestui que trust and trustee, and not between cestui que trust and trustee on the one side, and strangers on the other side. Therefore, where a cestui que trust and his trustee are both out of possession for the time limited, the party in possession has a good bar against them both." 113 Mo. at 197, 20 S.W. at 1067. After pointing out that "plaintiff took an equitable contingent remainder by force and effect of the deed of trust," and that, until the death of Ewing, Jr., "the entire legal title, a title in fee simple, was vested in the trustee," and that "it was the duty of the trustee to protect the title for those who should take upon the death of [Ewing, Jr.], as well as for [him] during his life," the court concluded: " * * * [W]e think the case comes within the rule that where the trustee is barred by lapse of time the beneficiaries are also barred, and that, too, though the beneficiaries are minors. That which bars the legal title here bars the equitable title. * * * Our conclusion is that the statute began to run against both the legal and equitable title when defendant took possession; that the legal and equitable titles were both barred by 10 years' adverse possession, and this, too, though the owner of the equitable title was, during all that time, an infant." 113 Mo. at 201–202, 20 S.W. at 1068–1069.

The quoted holding in Ewing, supra, was confirmed and followed in Walton v. Ketchum, 147 Mo. 209, 219, 48 S.W. 924, 927, and Huntington Real Estate Co. v. Megaree, 280 Mo. 41, 56, 217 S.W. 301, 305–306(6), where, in each instance, the statute of limitations was held to have run against the trustee and contingent remaindermen; and, in Johnson v. Wheeler, 360 Mo. 334, 338, 228 S.W.2d 714, 717, the law as declared in Ewing, supra, to have been

"now well settled," was quoted with approval. On the authority of Walton, supra, the same doctrine was adopted and followed in Schiffman v. Schmidt, 154 Mo. 204, 213, 55 S.W. 451, 453, and Simpson v. Erisner, 155 Mo. 157, 163, 55 S.W. 1029, 1030. See also Canada v. Daniel, 175 Mo. App. 55, 68–69, 157 S.W. 1032, 1036(10). The rule recognized in these Missouri cases is accepted and followed generally. Restatement, Second, Trusts, § 327, Comment g, p. 127; 4 Tiffany on Real Property (3rd Ed.), § 1153, pp. 454–455; 3 Scott on Trusts, § 327.1, 1. c. 1778–1779; Bogert on Trusts and Trustees (2d Ed.), § 583, 1. c. 224–225; annotation 2 A.L.R. 41, 55, § IV, and cases there collected. And see 28 C.J.S. Easements §. 9b, p. 644, where it is said that "[a]s a trustee is able in law to resist the use of the trust property by a third person, it follows that an easement over lands held in trust may be acquired by prescription as against both the trustee and the cestui que trust."

Revare v. Lee, Mo., 257 S.W.2d 676, neither cited nor indicated an intention to overrule Ewing, supra, or any of the line of cases tracking that authority, and we hereby reaffirm the doctrine enunciated and approved in those cases. Insofar as it is in conflict with that doctrine, Revare, supra, is not here, and should not be hereafter, followed. Evidence in the instant case as to the use of Tract (5) during the period from 1929 to 1953, when title was held by trustees, was and is properly for consideration.

After meticulous examination of the record and careful consideration of all briefs and the points presented therein, Hall v. Brookshire, 364 Mo. 774, 267 S.W.2d 627, 629(1), the divisional opinion of Pritchard, C., as supplemented by the foregoing, is hereby adopted as the opinion of the Court.