Norman H. JAEGER, Plaintiff-Appellant,

v.

Reed H. REYNOLDS and Eliza Jean Reynolds, Defendants and Third-Party Plaintiffs-Respondents,

William R. WEDEMEIER and Ella Wedemeier, Third-Party Defendants-Respondents.

No. 44461.

Supreme Court of Missouri.

Division No. 2.

March 14, 1955.

Ziercher & Tzinberg, Herbert W. Ziercher, F. William Human, Jr., Clayton, for Norman H. Jaeger, plaintiff-appellant.

Floyd D. Stewart, St. Louis, for Reed H. Reynolds and Eliza Jean Reynolds, defendants and third-party plaintiffs-respondents.

J. Leonard Walther, Clayton, for William R. Wedemeier and Ella Wedemeier, third-party defendants-respondents.

BARRETT, Commissioner.

The appellant, Norman H. Jaeger, instituted this action against his neighbors, Mr. and Mrs. Reed H. Reynolds, seeking a decree that he is entitled to an easement by prescription in the driveway between their adjoining properties and enjoining the defendants from interfering with his use of the driveway. The trial court found that the use by the plaintiff and his predecessors in title of that part of the driveway located on the defendants' lot had been permissive and revocable and, therefore, not adverse so as to establish an easement by prescription. Upon this appeal it is claimed that Mr. Jaeger "conclusively established his right to use of the driveway by prescription by proving continuous, open, visible, uninterrupted and adverse use for a period of more than ten years" and that, therefore, upon this review anew, Pahler v. Schoenhals, Mo., 234 S.W.2d 581, this court should reverse the judgment and decree his right to the easement.

Mr. Jaeger purchased his property, 9543 Holtwood, South Overland Park addition, in January 1951 and Mr. and Mrs. Reynolds purchased their property, 9601 Holtwood, in March 1951. There were no reservations or recitals in their muniments of title and so the rights of both parties and the existence or nonexistence of the claimed easement are dependent upon the acts and conduct of their predecessors in title. Annotation 171 A.L.R. 1278. In part, this controversy may inhere in the character of the subdivision and the fact that a plot of ground fronting 100 feet on Holtwood was subdivided into three lots of 33.4 feet each, Mr. Jaeger's house being located on the middle lot and the Reynolds house on the lot to the west. Upon this record the Reynolds title begins with 1940 when I eona Doelling transferred the property to Mr. and Mrs. Wedemeier, who lived there until their sale and transfer of the property to Mr. and Mrs. Reynolds in 1951. Mr. Jaeger's title begins with 1928 but the respondents contend that evidence prior to December 14, 1940 is not relevant and does not establish the plaintiff's case because Mr.

Shults, who purchased on that date, testified that when he moved into the property it was vacant and, therefore, it is urged that the claimed adverse use was not continuous prior to that date. In this the respondents are laboring under a misconception as to the meaning of "continuous" as applied to the acquisition of an easement by prescription. 5 Restatement, Property, Sec. 459, pp. 2935–2940. The question, however, is not essential to a determination of this appeal and is pointed out solely for the purpose of discrimination. For example, the record does not show that any one person in both chains of title once owned the adjoining lots and built both houses and the driveway and later sold the houses and lots to different owners, Di Pasco v. Prosser, Mo., 274 S.W.2d 279; Foxx v. Thompson, 358 Mo. 610, 216 S.W.2d 87, and there is no claim here and we are not concerned with an easement by necessity. Miller v. Berry, Mo. App., 270 S.W.2d 666, 671. In this connection the cases involving the acquisition of title to an entire plot or tract of land by adverse possession are not precisely in point in this action, they are applicable only by analogy. Annotation 27 A.L.R.2d 332, 334, 337. Use for the prescriptive period was established in this case, the difficulty and the problem is whether that use was *adverse*, and in view of the theory of the plaintiff's case and his specific emphasis and reliance upon the acts and conduct of the intermediate owners, from 1940 to 1951, to establish the adverse character of the use, the evidence prior to 1940 is not particularly helpful.

Both lots are 220 feet in depth and front 33.4 feet on Holtwood. The precise space between the two frame bungalows is not made to appear with certainty but towards the front of the two properties the driveway is 7 feet 9½ inches on the Reynolds lot and 4 feet 2½ inches on the Jaeger lot. At the rear of the houses and near their garages, the 80 feet in which the easement is claimed in length, the driveway is 8 feet 3½ inches on the Reynolds lot and 3 feet 9 inches on the Jaeger lot. Prior to the grading and paving of Holtwood the lots were level with the street. There does not appear

to be any curbing or curb line in front of the lots, but since the grading of the street there has been some grading upwards of the driveway, and the driveway consists of crushed chat spread on that part of the way utilized as a means of ingress and egress to the houses and garages.

The theory of the plaintiff's action and the essence of his claim is illustrated by his own testimony. Before he purchased the property he looked it over and "walked back out the driveway and it seemed like it was used by both parties at the time." He could see that part of the driveway was on his property and part of it on the Reynolds property and that when Mr. Reynolds used it and drove into his garage the right wheels of his automobile would be traveling on his lot. But the day he moved in, March 2, 1951, and attempted to use the driveway Mr. Wedemeier stopped him and informed him that he could not use the driveway. Mr. Jaeger told him that he thought and understood that it was a "share driveway," but Mr. Wedemeier said, "I didn't have a driveway, that it was his." In July Mr. Wedemeier sold his property to Mr. and Mrs. Reynolds and upon Mr. Jaeger's first attempt to use it Mr. Reynolds "blocked" the driveway with his car and informed Jaeger that he had no right to use it, but "I told him that I thought I did, because from the original time that I moved there, I understood it was a share driveway, until he asked me about the legal proof as to why I should be able to use it. * * * I knew I had some property there that other people were driving over, so why could not I have a right to drive over their property."

The theory of the plaintiff's case appears more precisely from the testimony, acts and conduct of his immediate predecessors in title and the character of the use made of the driveway during the periods of their occupancy of the premises. Mr. Shults purchased the property in December 1940 and within two weeks of his moving in started using the driveway and, according to him, used it continuously thereafter until he sold it to Mr. Schnur. At that time there was no garage in connection with the Jaeger property and "no driveway down toward the yard. I just pulled my car down in the driveway and made a right turn and parked it right in back of the house." During the same period of time, within the two weeks, he talked to Mr. Wedemeier about the driveway, he could not remember their "exact words," it had been too long ago, "but we just arrived at an agreement that we would use it. * * I told Mr. Wedemeier, I said, it was a partnership driveway and that I had a right to use it too, because the surveyor's stakes were still there when I moved there * * and I didn't measure anything, but it looked like I had part of the ground there too, and I could use it and he had part of it, and it would be a mutual concern to keep it open, and that was the agreement."

Mr. Schnur bought the property from Mr. Shults in March 1944 and as soon as he moved in had a conversation with Mr. Wedemeier concerning the driveway: "He thought I didn't have no driveway with the place, but I went to see where the other line was and I saw one track of the driveway was on my property. * * * I said I don't see why I can't use it, as part of it is on my property and part on his property." And, he said, "I used it." In 1945 Mr. Schnur built the garage onto the rear of the house and, despite Mr. Wedemeier's denials, it is a fair inference that he was aware of the fact that it was a garage and was used for that purpose. When he sold the property to Mr. Jaeger, he said, "I told him we had been using it together as a share driveway as long as I lived there and I didn't see no reason why it should not stay that way." Once, in explaining his conception of his rights, Mr. Schnur said, "I had intended to think about getting an easement later on, but I never did get that far."

Just how and when the driveway came about or was constructed is not made to appear with certainty from the plaintiff's evidence. Neighbors and a coal and ice deliveryman who had known the houses for thirty-five or forty years said that they had used and seen the driveway used by previous occupants and people making deliveries to both houses. During a part of

that period the houses, particularly the Jaeger property, fell into a state of disrepair. One neighbor who had lived across the street for fourteen years said that the driveway was there when he moved into the neighborhood but it was not chatted then, "it was mostly cinders." Mrs. Schnur did say that during their occupancy they had a dump truck load of gravel placed on the drive. On the other hand, Mr. and Mrs. Wedemeier lived at 9601 Holtwood a year as tenants before purchasing the property in September 1940. Mrs. Wedemeier, in describing the yards and driveway in 1939, said, "Well, there wasn't really no driveway in there; it was just a way of pulling up into the place there; this was cinders. * * * Between the two houses there, just wasn't no original driveway made. Just where machines would pull up in there. It wasn't finished, no chat or anything in there; just rock and bricks thrown in there." According to Mrs. Wedemeier, her husband graded the driveway, hauled chat and dirt in and built it up. Mr. Wedemeier said, "There was no drive when I bought it. The first thing I had to do was get about four tons of chat * * * so I could get in. * * * In the front yard there was cinders about two feet, on both front lawns, and I think Mr. Shults moved some of it and I moved some of it, so we could drive in on my drive and fix it up."

Mr. Wedemeier said that the occupant immediately preceding Mr. Shults, who lived there about a year, Mr. Hagberg, did not have an automobile and it was his position with all subsequent purchasers as soon as they moved in, as Mr. Shults and Mr. Schnur said, that their property did not have a driveway. As to Mr. Shults he said, "Yes, I told him I had 33 feet four inches, which leaves me seven feet in the front for a drive there, and I told Mr. Shults 'I have about seven feet, I think he has around three and a half to four feet in the back; that they have no drive.' * * * He asked me if he could use the drive and I said 'yes', for neighbor's sake." And as to Mr. Jaeger, "When he moved in, I told Mr. Jaeger the same thing and he jumped out there, 'it looks like it comes all the way back to the house', the way he jumped out there on it, he wanted to take the whole seven feet. * * * I said he couldn't use the driveway at all then."

■ In these detailed circumstances the use of the driveway by Mr. Jaeger's predecessors in title did not originate in an executed contract thereby establishing a basis for a claim "of right," as was the fact in the leading case of Sanford v. Kern, 223 Mo. 616, 122 S.W. 1051. And while Mr. Schnur may have once spread some gravel on the driveway, this is not an instance of prior adjoining lot owners jointly laying out, constructing and dividing the expense of a driveway for their common use on a common boundary line, the subsequent user of each being adverse to any claim of the other in denial of the use, as was the fact in Jacobs v. Brewster, 354 Mo. 729, 190 S.W.2d 894. See also Majors v. Bush, 356 Mo. 17, 200 S.W.2d 892 and annotation 27 A.L.R., loc. cit. 346. The fact is, despite his denials, that Mr. Wedemeier in utilizing the drive, as it exists, drove upon the land of his neighbor and they, of necessity, drove upon his land in making whatever use they did of the driveway. As indicated, there was user and the determinative question and the essence of this appeal is whether in the detailed circumstances the acts and conduct of the parties exemplify and demonstrate that required quality of "adverse use" essential to the acquisition of an easement by prescription. Jacobs v. Brewster, 354 Mo., loc. cit. 736, 190 S.W.2d, loc. cit. 896–897.

■ While the driveway, as it now exists, encroaches upon the Jaeger lot, there is sufficient space on the Reynolds lot for a driveway and so here both owners are not of necessity compelled to assert an adverse claim in the other's property. The fact is, as Mr. Wedemeier asserted, that he had 33 feet 4 inches and that left him 7 feet for a driveway. Mr. Shults and Mr. Schnur did talk to Mr. Wedemeier and while they claim that they mutually agreed to use the way as a common driveway, they both admit, particularly Mr. Schnur, that Mr. Wedemeier insisted that they "didn't have

no driveway." These physical facts as to the respective properties and the driveway, Anthony v. Kennard Bldg. Co., 188 Mo. 704, 721, 87 S.W. 921, 925, and the acts and conduct of the parties, especially in view of Mr. Wedemeier's insistence, do not compel the inference of adverse user, they rather indicate a user in subordination to and in recognition of his authority to either prevent or permit the use of that part of the driveway on his land, in short, a permissive use. Jacobs v. Brewster, supra. While the fact is not conclusive, there is another circumstance concerning the physical quality of the driveway as it now exists and that is its comparatively impermanent character. 41 Mich.L.R. 1130, 1131; annotation 27 A.L.R.2d, loc. cit. 339. The problem, for the most part, is one of drawing inferences from acts and conduct and it is possible that quite similar circumstances, without any collaboration between adjoining owners in establishing and using a common driveway, may become adverse in so far as subsequent attempts of either owner to restrict or deny the use is concerned, annotation 27 A.L.R.2d, loc. cit. 348, and that essentially is Mr. Jaeger's claim here. But in addition to the factors of the impermanence of the improvement, its possible relocation wholly upon the Reynolds lot and the prior acts and conduct indicative of subordinate use on the part of Mr. Jaeger's predecessors in title, is the additional factor that the use does not appear to have originated in concurrent action by adjoining owners or by a common owner of both lots. While Mr. Shults says that he and Mr. Wedemeier agreed upon the use of the driveway, the fact was that it was in existence and in some use when he purchased and moved into the property. Essentially, his claim was that, "I told Mr. Wedemeier, I said, it was a partnership driveway and that I had a right to use it too, because the surveyor's stakes were still there when I moved there * * * and I didn't measure anything, but it looked like I had part of the ground there too, and I could use it and he had part of it, and it would be a mutual concern to keep it open, and that was the agreement." Following Mr. Shults, Mr. Schnur owned the property for more than six years and the essence of his claim was not the agreed mutual use claimed by Mr. Shults but, "He thought I didn't have no driveway with the place, but I went to see where the other line was and I saw one track of the driveway was on my property. * * * I said I don't see why I can't use it, as part of it is on my property and part on his property," and, he "used it." From this testimony there are possible inferences favorable to Mr. Jaeger's claim of adverse use, but, in addition to the unfavorable factors noted and aside from the deference due the trial court, there are other reasonably permissible inferences which do not demonstrate that requisite quality of adverse use necessary to the acquisition of an easement. "If the driveway commenced simply in a use by one of the adjoining owners, or at most is not distinctly shown to have originated in concurrent action by adjoining owners, nor through provision made by anyone who at the time owned both properties, the finding that the user was not adverse may be well supported." Annotation 27 A.L.R.2d loc. cit. 354; Hubbard v. Grandquist, 191 Wash. 442, 71 P.2d 410. And ultimately that is the situation upon this record, the weight of the contrasting circumstances indicate, as the trial court expressly found, permissive rather than adverse use, accordingly the judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

ELLISON, P. J., LEEDY, J., and BROADDUS, Special Judge, concur.