James O. BUNYARD and Opal Bunyard,
Respondents,

v.

J. M. TURLEY and Lucy Turley, his wife,
Laura Robinson and E. T. Robinson,
her husband, Appellants.

No. 52780.

Supreme Court of Missouri,
Division No. 2.

March 11, 1968.

H. L. C. Weier, Dearing, Richeson, Weier & Roberts, Hillsboro, for respondents.

Earl R. Blackwell, Hillsboro, for appellants.

ALVIN C. RANDALL, Special Judge.

Plaintiffs' action seeks an adjudication to the effect that they have acquired an easement by prescriptive use. The judgment in the trial court was for plaintiffs for part of the relief prayed for, and defendants appeal.

Plaintiffs own a tract of land lying immediately east of and adjacent to Jeffer-

son County Highway JJ, also known as old Highway 61. J. M. and Lucy Turley own a tract of land adjoining plaintiffs' land on the north. There is, and has been since about 1907, an unimproved roadway running generally east and west at or near the line dividing the two properties. Plaintiff James Bunyard testified that the north tract was owned by Mr. and Mrs. Turley and Mr. and Mrs. Robinson. The Robinsons are not again mentioned in the evidence; nor are they mentioned in the petition, although they are named in the caption. No answer on their behalf appears in the transcript and no order specifically naming them appears. The answer contained in the transcript is the separate answer of Mr. and Mrs. Turley. The judgment of the court is against "defendants". Any further reference in this opinion to "defendants" should be taken to mean Mr. and Mrs. Turley.

In Count One of their petition plaintiffs allege that they possess an easement, by reason of adverse use for more than 10 years, of a 10 foot strip of land to which defendants hold record title. It is alleged that the strip of land extends from the east side of Highway JJ eastward for a distance of 580 feet. It is pinpointed by an exact legal description by metes and bounds, with references to sections, townships, ranges and iron pins. Count One prays that the court declare title to the easement in plaintiffs and enjoin defendants from interfering with plaintiffs' rights. Count Two alleges that in November 1961 defendants constructed a fence on the south side of said 10 foot strip of land, that plaintiffs removed the fence, and that defendants then reconstructed it. The court is requested to enjoin the defendants from maintaining the fence or otherwise obstructing the roadway. Count Three is for damages. Defendants filed a general denial. The judgment is to the effect that plaintiffs own an easement in the 10 foot strip of land, but only from a point commencing 141 feet east of Highway JJ and extending 126 feet to the east

from that point. Defendants contend that the judgment should have been in their favor. Respondents assert in their brief that the judgment should have held that they are entitled to an easement in the strip for a distance of 400 feet.

The testimony of each witness is very confusing, and it is difficult to say that any fact is established with any reasonable degree of certainty. However, by carefully studying the entire transcript and by placing the implications of one witness alongside the approximations, suggestions and speculations of another witness, one is able to draw some reasonable inferences with regard to some of the facts.

About 1907 a Mr. Nick Decker, who lived somewhere east of the properties now owned by the parties to this action, "cut" a road from his house to Highway JJ. Plaintiffs say they have used the road since 1931, when they bought a piece of land somewhere in that general area. Plaintiffs bought the 32 acre tract on which they now live in 1933. They bought the 5 acre tract on which defendants now live in 1936, and sold it to defendants in about 1946. The deed to defendants made no reference to the road nor to an easement, according to the testimony of the parties, although the deed was not offered in evidence. Plaintiff Opal Bunyard testified that at the time of the sale her husband stated to Mr. Turley that the road was partly on each tract of land, and Mr. Turley said that he understood. Lucy Turley denied that there was any conversation about the road, and Mr. Turley did not testify. Sometime in the late 1940's plaintiffs constructed a home on the 32 acre tract. From that time until 1958 plaintiff James Bunyard, according to his testimony, spent some time at the home, but actually lived and worked in St. Louis. He retired in 1958. Plaintiffs' home and a carport are near the old roadway and to the south of it. The distance the buildings are east of Highway JJ is not established. The Turleys live in a home north of the old roadway, and apparently fairly close to the

Bunyard home. A few people who lived to the east of the parties' properties used the old road many years ago. The number of users is not established by the evidence, but it was probably never more than three or four. Some witnesses said it was sometimes used to get to a school, but another witness said that it did not go as far as the school. At some time after the road came into existence a "county road" was established. The evidence does not reveal when it was constructed nor where it was constructed. However, since the witnesses state that this reduced the use of the road by residents to the east, we must assume that it was built in such a location that it was more convenient for the residents to use than it was for them to come down the old roadway to Highway JJ. When plaintiffs purchased the 32 acre tract in 1933, there were only two people other than plaintiffs using the road. At the time this controversy arose the only person using the road other than the plaintiffs was a Mr. Bequette. He owns some property to the east, but has no home on it. Since defendants constructed the fence, they permit Mr. Bequette to use the roadway to the north of the fence when he has occasion to come to Highway JJ.

At some place east of Highway JJ and west of plaintiffs' home there is an oak tree, about two feet in diameter, somewhere near the middle of the old roadway. In 1952 or 1954 defendant J. M. Turley parked an old truck in the roadway near the tree. Defendants' evidence is that it was about the center of the roadway, and plaintiffs' evidence is that the truck was on the north edge, but in the roadway. The truck remained there for a few years, during part of which time there were no tires on it. Plaintiffs voiced no complaint about this obstruction. In approximately 1957 defendants complained that plaintiffs' automobile had been brushing against some rocks which defendants had placed at the north bank of the roadway to prevent washing, and thereby dislodging them. Plaintiff Opal Bunyard arrived one day in her automobile and found that there were two large stones in the middle of the roadway. She asked Mr. Turley why he put them there and he told her he did not want her "driving on this road" and said, "Just drive over on yours". She told him she could not get through because of the mud. In about 1960 defendants constructed a fence for a distance of 400 feet, east from Highway JJ. It is in line with the oak tree. Plaintiffs removed the fence. Defendants reconstructed the fence, and this action followed.

We hold that whatever use plaintiffs made of any part of defendants' land prior to 1957 was permissive and could not ripen into a prescriptive right. Mr. Bunyard testified that the roadway was 24 feet wide, and that the entire roadway "was used". He did not expressly state that he used all 24 feet. Such testimony could not be accepted as the basis for imposing a burden on defendants' property. A right of way of 24 feet is enough to accommodate a modern three lane highway. It is completely illogical and contrary to human experience to assert that a country road, with no permanent improvements and carrying an extremely limited amount of traffic, is used by all motorists, including plaintiffs, continuously for 10 years over the entire width of the 24 foot roadbed. Do the circumstances lead to the conclusion that there is *one* road, 24 feet wide, used in common by the two property owners, the use by each being of such character as to be adverse to the right of the other to have exclusive use of his own property? It is at least just as logical to infer from the circumstances that there are two roadways, one on each side of the property line. The fact that a tree was permitted to grow and remain near the middle is not consistent with the proposition that the parties considered it to be a single, indivisible, 24 foot roadway. We must not only, in determining whether the use was adverse or permissive, look to the conduct of the parties, but also to the physical facts. The conclusions to be drawn from the conduct of

the parties where there is a driveway at or near a property line may be entirely different from the conclusions to be drawn from the same conduct of the parties in those cases in which one man establishes and uses a driveway *through* another man's property. In the first type of situation, if one man strays across the line, it may be interpreted as an act of temporary convenience, or even of inattention. The acquiescence of the owner of the property upon which there has been an encroachment, may be permissiveness, within the meaning of the law, until there is some reason to believe his neighbor is acting in a manner adverse to the rights of the owner. In Anthony et al. v. Kennard Bldg. Co., 188 Mo. 704, 87 S.W. 921, 926, this court said:

"If the owner of the Ames property had stationed a guard to warn the Abadie tenants to keep within the limits of their own 2 feet 1¾ inches, the act could have been attributed to no motive except a desire to show an unfriendly or unneighborly feeling. If the tenants of the Abadie property, in passing through the alley, from the front to the rear of their premises, veered a little to the east and got on the Ames side of the line, how was it practicable, even if desirable, to keep them off?"

■ And there is no proof that defendants ever knew, except in 1957 when plaintiffs' "side" of the road was muddy at least at one point, that plaintiffs ever used that part of the road which is on defendants' property. To establish a prescriptive right there must be proof of actual knowledge by the landowner, or use of such a character that knowledge will be presumed. Burnett v. Sladek, Mo.App., 251 S.W.2d 397, 400. Plaintiffs rely on the proposition that, in the absence of a showing that the use was permissive in its origin, proof that the use was open, continuous, visible and uninterrupted for a 10 year period casts the burden on the landowner to prove that the use was permissive, rather than adverse, citing Fassold v. Schamburg, 350 Mo. 464, 166 S.W.2d 571, and Dalton v. Johnson,

Mo., 320 S.W.2d 569. First, plaintiffs have not sustained *their* burden of proving that they used the northern portion of the 24 foot roadway "openly, continuously, visibly and without interruption" for the necessary 10 year period. Second, the physical circumstances were entirely different in the cases cited by plaintiffs. In both instances the passageway was across and over defendant's land. There was also additional evidence indicating adverse use. In the Dalton case, for example, the passageway had been *enclosed* by a fence for many years, which had deteriorated and been replaced or repaired at various times. In the Fassold case it was conceded that the landowner had, sometime after plaintiff commenced using the passageway, requested and secured *plaintiff's* permission to move a wire fence closer to the passageway than it had been previously. And in both cases it was established beyond any question that the use had been open, continuous, visible and uninterrupted for the prescribed period.

■ If we accept as true, for the moment, the allegations of the petition, to the effect that the fence has been built at the south edge of the 10 foot strip in which plaintiffs claim an easement, it is apparent that plaintiffs at all times had 14 feet of roadway, under their own testimony, on which to travel. Therefore, considering the states of mind, attitudes, and motives which give meaning to the conduct of individuals, there would appear to be no reason, good or bad, selfish or unselfish, why plaintiffs would assert an adverse claim to any of defendants' land, in order to drive to and from Highway JJ. When the issue must be determined from physical facts and the conduct of the parties, it may assist us in determining whether, in fact, the use was adverse if there was no necessity or reason for asserting an adverse claim. Jaeger v. Reynolds, Mo., 276 S.W.2d 182, 186.

■ Whether there exists in this case one roadway, or two roadways side by side, its—or their—comparatively impermanent character is a circumstance to be con-

sidered, although it is not conclusive in itself. Jaeger v. Reynolds, supra, 276 S.W. 2d l.c. 187. Plaintiff James Bunyard testified that he has put ten loads of rock and gravel on the road from 1933 to 1963. There is no other evidence of maintenance. This is very little maintenance over a period of thirty years for a road that is 24 feet wide and 400, or 580, feet long. In 1957, when Mr. Turley put some stones in the road to keep Mrs. Bunyard off the north side of the road, it is a reasonable inference from Mrs. Bunyard's testimony that the reason she protested was that there had been a lot of rain and the south side of the road was so muddy as to be impassable.

■ A finding of adverse use, which is essential to the acquisition of an easement by prescription, is not supported by the evidence in this case. White v. St. Louis Post Offices Corporation, 348 Mo. 961, 156 S.W.2d 695, 700.

■ There is another reason why plaintiffs are entitled to no relief in this case. There is no substantial evidence to prove what part, if any, of the alleged 24 foot roadway is on defendants' property. There were no deeds, plats, nor surveys introduced into evidence. Nor did any surveyor testify. The oral testimony established that defendants' property lies north of plaintiffs' property. The existing fence, the construction of which precipitated this lawsuit, extends from Highway JJ due east a distance of 400 feet, but there is no testimony concerning the distance that defendants' property extends east of the highway. Plaintiff James Bunyard testified that the roadway is 24 feet wide, with 14 feet being south of the existing fence and 10 feet north of the fence. The fence runs due east and west but the road is "not running truly east and west, it has some angles in it". But where is the property line with respect to the road or the fence, or "the big oak tree"? Mr. Bunyard made the general statement that the roadway is "along

that boundary line". He further testified as follows:

"Q How far over on your property did this roadway extend?

"A *Well the way the fence is divided there*, it's 14 foot.

"Q I see. And how far over on the Turley property does it extend?

"A Ten foot."

In view of the fact that the existing fence is in line with the oak tree, and in view of Mr. Bunyard's subsequent testimony, it is reasonable to infer that Mr. Bunyard did not mean that the property line was where the existing fence is located, but only that the roadway itself extended 14 feet south and 10 feet north of the *fence*. And the subsequent testimony of Mr. Bunyard reveals that he has no idea where the line is with respect to the road. He testified as follows:

"Q You actually sold this property to the Turley's didn't you?

"A That's right.

"Q When you sold it to them you told them that Black Oak Tree there was on the line, didn't you?

"A I did not. * * *

"Q This old fence that was there, is that along the same line now, the new fence?

"A A little south of that.

"Q A little more on you, this old fence was?

"A Yes, that's right. * * *

"Q Where does this fence go to from that Old Black Oak, where does that go to?

"A It goes due east.

"Q Is that the same direction this other fence goes?

"A That is the fence, yes.

"Q I'm talking about that old fence you're talking about.

"A That's right.

"Q All right, what about it, which way did it go?

"A It went due east.

"Q When was that in there?

"A That was there when I bought this property from Mr. Turley that was about, or from Mr. Fraizer, I bought that about '33.

"Q 1933 and then you took out the fence?

"A I didn't take it out right away, no, it wasn't taken out until I started to build up there, that was about, I forget, I think it was around '44 or '45. * * *

"Q Now you say it's been a roadway for what, how many years?

"A That I know of since 1931.

"Q 1931? Still you say when you went there in '31 there was a fence there?

"A This fence didn't block the road the road wasn't closed, *there was a fence on each side of the road at that time,* there was a fence over on the 32 acres and a fence over on the 5 acres.

"Q Where would this fence from this Black Oak go, which side was it on?

"A It was on the south side.

"Q It was on the south side, is that your north line?

"A Yes sir.

"Q That was your north line when you purchased it?

"A That's right.

"Q Was the fence that run east from the Old Black Oak Tree?

"A That's right.

"Q Then later you purchased that over south of the fence, is that right?

"A North of the fence.

"Q All right, you purchased north of the fence, who did you buy that from?

"A I bought that from Mr. Pannell.

"Q Where did your line start north of the fence, did it start at the fence or where did it start?

"A No, it started over on the north side of this roadway.

"Q You bought that land?

"A I think that was about '36. * *

"Q Does that fence at the present time occupy the same line that the old fence occupied?

"A No, it's north of it.

"Q It's north of it about how far?

"A I'd say a couple of feet.

"Q A couple of feet north?

"A The survey we had made there when I bought this property, there's a steel peg that the surveyor drove in the center, it's about 4 foot north of this Black Oak Tree, so we come over here and couldn't find the records of that survey that was made, but that was when I bought this property from Frazier that that survey was made and that peg is still standing there today right in the center of that road about 4 foot from that wall that he's put up there. Now the surveyor that he brought there got a different survey on that, he goes about 4 foot south of that peg that we made in, I think it was, 1934 or '35."

If this testimony means anything at all, one might conclude that the property line is at the black oak tree, or that it is four feet north of the black oak tree, or that it is somewhere south of the black oak tree, or that there are two property lines, one at the north edge of the roadway and one

at the south edge of the roadway. There was no other evidence concerning the location or description of defendants' land.

The petition, as previously mentioned, referred only to a 10 foot strip of land which plaintiffs had allegedly used for more than 10 years. It was described only by references to ranges, townships, sections, quarter sections and iron pins. There was no effort to connect any of the physical conditions or objects mentioned in the evidence—not even the road itself—with the allegations of the petition.

This cause is reversed and remanded with instructions to the trial court to set aside the judgment for plaintiffs and enter judgment in favor of defendants.

FINCH, P. J., and EAGER, J., concur.

DONNELLY, J., not sitting.